IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

JAMES HOWARD TYMAN,              )
                                )
                    Plaintiff,  )
                                )
        v.                      )        Case No. 4:12-CV-W-01022-REL-SSA
                                )
CAROLYN COLVIN, Acting Commissioner )
of Social Security,             )
                                )
                    Defendant.  )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff James Howard Twyman seeks review of the final decision of the Commissioner

of Social Security partially denying plaintiff's application for disability benefits under Title II of

the Social Security Act ("the Act").   Plaintiff argues that the Administrative Law Judge (ALJ)

failed to properly (1) evaluate the opinions of a treating psychiatrist and a treating primary care

physician; (2) evaluate all of the non-medical evidence of record; (3) evaluate the credibility of

plaintiff and plaintiff's wife; and (4) account for all of plaintiff's mental limitations in his mental

residual functional capacity (RFC).   I find that the substantial evidence in the record as a whole

supports the ALJ's finding that plaintiff was not disabled from October 18, 2005 through April

24, 2008.   Therefore, plaintiff's motion for summary judgment will be denied and the decision

of the Commissioner will be affirmed.

## I.   *COMMISIONER'S DECISION*

On October 31, 2005, plaintiff protectively filed his application for a period of

disability and disability insurance benefits.   He alleged disability since October 18, 2005 (Tr.

89-93).   Plaintiff alleged disability due to a combination of physical and mental impairments

(Tr. 147).   On January 27, 2006, plaintiff's claim was denied at the initial level (Tr. 61-67).

On April 29, 2008, a hearing was held before the ALJ (Tr. 31-57).   On May 20, 2008, the ALJ

found that plaintiff was not under a "disability" as defined in the Act (Tr. 12-25).   On June

19, 2009, the Appeals Council denied plaintiff's request for review (Tr. 1-4).[1]

Plaintiff, having exhausted his administrative remedies, filed a complaint with the United States District Court for the Western District of Missouri, Western Division (Case No. 09-CV-0622-JTM). On June 25, 2010, following oral arguments on June 24, 2010,United States Magistrate Judge John T. Maughmer reversed the ALJ's decision and remanded plaintiff's claim to the Commissioner of Social Security under sentence four of 42 U.S.C. § 405(g) for further proceedings (Tr. 356-76). On September 7, 2010, the Appeals Council vacated the final decision of the Commissioner and remanded plaintiff's claim to the ALJ for further proceedings (Tr. 352-55).

On December 30, 2010, the ALJ conducted a hearing. At the conclusion of the hearing, he determined that it was necessary to supplement the medical record through the performance of consultative examinations (Tr. 333-51). On February 11, 2011, plaintiff underwent a consultative psychological examination by Nina L. Epperson, M.S. (Tr. 581-91). On February 14, 2011, plaintiff underwent a consultative neurologic examination by John J. Sand, M.D. (Tr. 592-600). On August 10, 2011, the ALJ conducted a supplemental hearing (Tr. 304-22). On October 27, 2011, the ALJ found plaintiff had been under a "disability" since April 25, 2008, but not prior thereto (Tr. 284-300). On November 7, 2011, plaintiff requested review of the October 27, 2011 decision (Tr. 281-83) and on January 26, 2012, plaintiff filed exceptions to the October 27, 2011 decision (Tr. 273-74). On June 8, 2012, the Appeals Council declined to assume jurisdiction in the case (Tr. 270-72). Therefore, the October 27, 2011 decision of the ALJ stands as the final decision of the Commissioner.

---

[1] Although not a part of the direct evidence of record, while the 2005 claim was pending with the Appeal's Council, plaintiff filed a new application for a period of disability and disability insurance benefits. The 2008 claim was also denied at the initial level and a request for hearing was filed. According to plaintiff's counsel at the December 2010 hearing, the request for hearing on the 2008 claim was dismissed in early 2010 pursuant to a request for withdrawal by plaintiff (Tr. 336). However, documents from the 2008 claim, including objective medical evidence, have been added to the record for the 2005 claim.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return

to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.   42 U.S.C. § 423(d)(1)(A).   If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.   Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.   These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.   The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

    Yes = not disabled.
    No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

    No = not disabled.
    Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

    Yes = disabled.
    No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

    No = not disabled.
    Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

    Yes = disabled.
    No = not disabled.

*IV.*    ***THE RECORD***

The record consists of the testimony of plaintiff, his wife Jean Twyman, and vocational expert Marianne K. Lumpe, M.A., at the April 29, 2008 hearing; the testimony of medical expert Alfred G. Jonas, M.D., at the December 30, 2010 hearing; and the testimony of medical expert Dr. Jonas, plaintiff, plaintiff's wife, and vocational expert Denise Waddell at the August 10, 2011 hearing; and the documentary evidence admitted at the August 10, 2011 hearing.

*A.*    ***ADMINISTRATIVE REPORTS***

The record contains the following administrative report:

**1.    Earnings Report**

The record shows plaintiff earned the following income from 1971 through 2009:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1971 | $      71.25 | 1991 | $19,261.34 |
| 1972 | 855.25 | 1992 | 25,085.10 |
| 1973 | 754.03 | 1993 | 28,514.26 |
| 1974 | 485.88 | 1994 | 24,884.05 |
| 1975 | 674.87 | 1995 | 27,258.97 |
| 1976 | 250.82 | 1996 | 27,599.18 |
| 1977 | 2,391.25 | 1997 | 30,166.02 |
| 1978 | 3,692.86 | 1998 | 31,337.77 |
| 1979 | 9,098.06 | 1999 | 31,028.40 |
| 1980 | 7,600.86 | 2000 | 33,070.72 |
| 1981 | 7,555.30 | 2001 | 31,512.40 |
| 1982 | 9,151.50 | 2002 | 30.888.22 |

| | | | |
|---|---|---|---|
| 1983 | 10,750.20 | 2003 | 19,084.88 |
| 1984 | 12,015.00 | 2004 | 25,579.18 |
| 1985 | 13,045.80 | 2005 | 21,264.82 |
| 1986 | 13,412.25 | 2006 | 9,600.00 |
| 1987 | 9,347.96 | 2007 | 9,600.00 |
| 1988 | 11,036.18 | 2008 | 9,600.00 |
| 1989 | 15,578.75 | 2009 | 9,600.00 |
| 1990 | 17,527.92 | | |

(Tr. 476-78).[2]

## B.   SUMMARY OF MEDICAL RECORDS

As summarized by plaintiff on appeal, the medical record reflects diagnosis and treatment of multiple medical problems including bipolar disorder, hepatitis C, and arthritis with a history of surgery of the lumbosacral spine and elbows.

## C.   SUMMARY OF TESTIMONY

During the April 29, 2008 hearing, testimony was taken from plaintiff; Jean Twyman, plaintiff's spouse; and Marianne K. Lumpe, M.A., a vocational expert (Tr. 87-88).   During the December 30, 2010 hearing, testimony was taken from Alfred G. Jonas, M.D., a medical expert (Tr. 432-35).   During the August 10, 2011 hearing, testimony was taken from Dr. Jonas; plaintiff; plaintiff's spouse; and Denise Waddell, a vocational expert (Tr. 464-65).

## 1.   Plaintiff's Testimony

Plaintiff was 52 years old at the time of the April 2008, hearing, and he was 55 years old

---

[2]  The most recent earnings record was created on October 12, 2010, in anticipation of the December 30, 2010 hearing.   Therefore, it does not have postings for any of 2010.   However, other Social Security Administration records have postings of $2,400.00 for the first quarter of 2010 and $2,400.00 for the second quarter of 2010 (Tr. 487).   Although plaintiff testified at the August 11, 2011 hearing that he was still working (Tr. 313), the record does not include postings of plaintiff's income after the second quarter of

at the time of the August 2011, hearing.   Plaintiff has a high school diploma and some college (Tr. 36, 316).

In 2008 and 2011, plaintiff testified that he works four hours day, five days a week, for 20 hours a week, repairing leaks and maintain pumps for an oil company; and is paid $800.00/month, an amount that keeps him under the Social Security substantial gainful activity level (Tr. 36-39, 41-43, 313-14).   Plaintiff reported that he worked for the same oil company for two and one-half years before 2008 (Tr.38).

Prior to his employment with the oil company, plaintiff reported that he worked for a heating and air conditioning company, first installing duct work and later in the parts room; worked for the City of Peculiar, Missouri, first as a lawn mower and later reading meters, fixing water main leaks, and performing odd jobs; and, finally, worked for elevator/chair lift manufacturer as a machine operator, assembler, and packager (Tr. 39-40).

In 2008, when questioned about what prevents him from working, plaintiff said his memory and described incidents, both on the job and at home, when he forgot things or lost focus.   Plaintiff also stated that he had lost jobs due to his memory problem, and that he doubted he would have his then-current job except for his long-term friendship with his employer (Tr. 40, 42-46, 314, 316-19).

In 2008, plaintiff testified that he has back and elbow problems, and that earlier he had undergone low-back surgery.   Plaintiff reported he has to be cautious when sitting or he will experience low-back stiffness.   Plaintiff reported that it is hard for him to lift items and must avoid repetitious work, and that he had earlier undergone bilateral elbow surgeries (Tr. 40, 44-45, 316).

In 2008, plaintiff also reported fatigue caused by his hepatitis C (Tr. 40-41, 43).

2010.

**2.** **Testimony from Plaintiff's Wife**

In April 2008, and August 2011, Jean Rose Twyman, plaintiff's wife, testified. In 2008, Ms. Twyman, reported that plaintiff has problems with memory, is easily distracted loses focus, and is incapable of following through on tasks (Tr. 47-9). The wife said that she does not leave plaintiff alone and keeps him on a very strict schedule (Tr.49-50). Ms. Twyman reported that her husband's then-current employer is a childhood friend and understanding of plaintiff's condition (Tr. 50).

In 2011, Ms. Twyman reported deterioration in her husband's ability to prepare for the day (Tr. 321). The wife testified that plaintiff forgets people's names and that she must be with him all the time. Plaintiff's wife described plaintiff's memory problems as dating back to his work at Access Industries and continuing through his employment with the City of Peculiar and the heating and cooling company. Ms. Twyman attributed the memory problems to plaintiff's medication. The wife described her husband's then- current employer as a family friend who does not leave plaintiff alone because his poor memory results in mistakes (Tr. 321-25).

**3.** **Medical Expert's Testimony**

In December 2010, and August 2011, Alfred G. Jonas, M.D., testified at the request of the ALJ. Dr. Jonas expressed confusion by conflict between the significant problems reported by plaintiff's psychiatrist, and the balance of the record that showed plaintiff's bipolar disorder was not causing functional problems. When previously undisclosed records from a 2008, consultative psychological examination with memory testing were described to Dr. Jonas, the doctor concurred that they supported the psychiatrist's opinions, and he recommended that the record be supplemented with a neuropsychological examination (Tr. 338-49).

Due to cost, the recommended neuropsychological examination was never conducted;

.

instead, intelligence testing and a neurologic examination were performed.

In August 2011, when referring to the then-current record, which included the results of the 2011 intelligence testing and the neurologic examination, Dr. Jonas testified that the updated record failed to support the treating psychiatrist's opinion that plaintiff has marked limitations in concentration, persistence, or pace (Tr. 307-08). Dr. Jonas cited 2008 statements by the consulting psychologist characterizing him as uncooperative and his effort as poor. Dr. Jonas also cited 2011 statements by a second consulting psychologist describing plaintiff as unmotivated and his efforts as not strong. Dr. Jonas concluded that plaintiff's alleged deficiencies in performance were the result of an inadequate effort. Dr. Jonas indicated that his conclusion was supported by plaintiff's part time employment for the oil company and his daily activities (Tr. 308-09).

4.      **Vocational Experts' Testimony**

In April 2008, Marianne K. Lumpe, vocational expert, testified at the request of the ALJ. In August 2011, Denise Waddell, vocational expert, testified at the request of the ALJ. Both experts classified the plaintiff's past jobs as semi-skilled to skilled, and medium to heavy, as they are performed in the national economy (Tr. 52-53, 326-28).

In April 2008, when asked to assume an individual with plaintiff's age, education, past work experience, and a residual functional capacity (RFC) for medium work but limited to simple, repetitive, unskilled work, Ms. Lumpe said that plaintiff would be able to perform a wide range of medium unskilled work. The expert listed landscaping specialist and industrial cleaner as examples at the medium exceptional level; and light cleaner, mail clerk, and cashier II as examples at the light exceptional level (Tr. 53-54).

In August 2011, when asked to assume an individual with plaintiffs' age, education, past work experience, and capability of the full range of medium work except he is limited to work

that requires no detailed instructions or tasks and which is repetitive, Ms. Waddell said that plaintiff could return to his job as a packager. The vocational expert also said that plaintiff could perform medium unskilled jobs, such as a lamination assembler, counter-supply worker, and twisting-machine operator; and could perform the light unskilled job of small-parts assembler (Tr. 328-29).

Both vocational experts testified that being off task for two or two-and- one-half hours during an eight-hour workday (Tr. 54-55, 329-30), missing work more than six hours a day or one day a month (Tr. 55-56, 330) and requiring more than customary breaks, would render plaintiff unemployable.(Tr. 56-57, 330).

Both vocational experts stated that their testimony was consistent with the Dictionary of Occupational Titles (DOT) (Tr. 37, 330).

## V.    FINDINGS OF THE ALJ

ALJ George M. Bock issued his opinion on October 27, 2011. The ALJ found that plaintiff had worked since October 18, 2005, the alleged disability onset date, but that his work did not rise to the level of substantial gainful activity. The ALJ found that plaintiff has the following severe impairment: bipolar disorder, with borderline memory functioning and very poor concentration, persistence, and pace. The ALJ found that plaintiff's complaints about elbow surgery, lumbosacral spine surgery, and hepatitis C, did not qualify as severe impairments. The ALJ found that none of plaintiff's impairments met or equaled the severity requirements of a listed impairment in Appendix 1.

For the period from October 18, 2005, through April 24, 2008, the ALJ found that plaintiff retained the RFC to perform a full range of work at all exceptional levels, but that he could not follow any detailed instructions; needed tasks that required repetition; and therefore plaintiff could return to his past relevant work as a packager; and could perform other jobs

10

existing in significant numbers in the national economy during that period of time. However, for the period after April 24, 2008, the ALJ found that plaintiff, while retaining the RFC to perform a full range of work at all exceptional levels, could not stay on task more than three-to-four hours a day and therefore would be unable to perform any of his past relevant work or any other jobs existing in significant numbers in the national economy. Accordingly, the ALJ found plaintiff disabled since April 25, 2008, but not before (Tr. 284-300).

*VI. ANALYSIS*.

**A. OPINONS OF TREATING PSYCHIATRIST AND FAMILY PHYSICIAN**

Plaintiff first argues the ALJ erred by failing to give controlling weigh to the opinions of plaintiff's family physician and psychiatrist. Plaintiff argues that while the ALJ gave the psychiatrist's opinion controlling weight for the period that began on April 25, 2008, he failed to articulate what, if any, weight he gave the psychiatrist's opinion for the period before that date. Plaintiff further argues that the ALJ failed to articulate why plaintiff's mental health disorder was disabling after April 24, 2008, but not before then.

Plaintiff also argues that the ALJ failed to provide any finding about the weight to be given to his family physician's September 2006, opinion. Plaintiff argues that the family physician's opinion must be controlling because it is the only medical opinion about plaintiff's physical health.

In response, defendant argues that the psychiatrist's opinion was not entitled to controlling weight until April, 25, 2008 because the evidence showed that plaintiff's mental condition began to deteriorate at that time.

Defendant also argues that the ALJ noted that he was giving lesser weight to the family doctor's opinions because they predated April 2008.

Medical source statements are medical opinions submitted by acceptable medical sources, including treating sources and consultative examiners, about what an individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis. SSR 1996-5; see 20 C.F.R. §404.1513(a) (defining "acceptable medical source"). Generally, the opinions of an examining psychologist or physician should be given greater weight than the opinions of a source who had not examined the claimant. Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003).

The opinion of a treating physician is "generally given controlling weight, but is not inherently entitled to it." Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) (quoting Hacker v. Barnhart, 439 F.3d 934, 937 (8th Cir. 2006). An ALJ may elect not to give controlling weight to a treating physician when the opinion is "not supported by diagnoses based on objective evidence" or if the opinion is "inconsistent with or contrary to the medical evidence as a whole." Id. A treating physician's opinion may be entitled to less weight when the opinion is not supported by his or her own treatment notes. See Owen v. Astrue, 551 F.3d 792, 789-99 (8th Cir. 2008).

When I examine the record, I find several, often conflicting, opinions by treating, examining, and consulting doctors on plaintiff's physical and mental condition.

On December 29, 2005, Timothy Link, M.D., a medical consultant for the Missouri Disability Determination Services (DDS), concluded that plaintiff retained the ability to perform a wide-range of medium work (Tr. 176-83).

On September 11, 2006, Douglas Bradley, M.D., plaintiff's family physician, opined that plaintiff was unable to maintain a full day's work because of easy fatigability and generalized asthenia caused by his hepatitis C (Tr. 214-15).

On November 17, 2008, at the request of the Missouri DDS, Rene K. Debroy, M.D., examined plaintiff for the 2008 claim. As to his past medical history-physical, plaintiff reported arthritis in his low back, elbows, and hands, with surgery of the lower back and elbows. He also noted a history of being treated for hepatitis C. Plaintiff described chronic low back pain, fatigue, and weight loss. Plaintiff related that his main exertional restriction was on lifting more than 25 pounds. Upon completion of the physical examination, Dr. Debroy's impressions were of chronic low back pain that was controlled with medications with a history of lumbar surgery; history of a bipolar disorder; history of hepatitis C; and history of arthritis in the elbows, status post-surgery. Dr. Debroy felt plaintiff's only limitation was lifting no more than twenty-five pounds on an occasional basis (Tr. 579-80).

On February 14, 2011, at the request of the ALJ, John J. Sand, M.D., examined plaintiff. Physical examination was unremarkable except for a well-healed vertical scar from the prior back surgery. The doctor's only exceptional limitation suggested, based upon plaintiff's subjective complaints, was a restriction to occasional lifting of 25 pounds (Tr. 592-600).

Although the ALJ did not specifically name Dr. Bradley in his decision, he did find that the opinions predating April 25, 2008, were entitled to lesser weight. I note that Dr. Bradley's opinion dates back to September 2006. Although plaintiff argues that Dr. Bradley's opinion is the only one dealing with his physical limitations, the record includes the opinions by Dr. Lind, a medical consultant; Dr. Debroy, an examining physician; and Dr. Sand, an examining physician. None of these opinions supports Dr. Bradley's 2006, conclusion.

As to Dr. Bradley's September 2006 statement that plaintiff was unable to work for a full day, such statements are not controlling. The final responsibility for deciding the issue of disability is left to the Commissioner. 20 C.F.R. §§ 404.1527(c) and 416.923(c) and Social Security Ruling (SSR) 1996-2p.

Concerning plaintiff's argument that his disabling fatigue is due to the hepatitis C, that

argument is contradicted by his own statements to Dr. Debroy and Dr. Sand. Specifically, during Dr. Debroy's examination, plaintiff reported "some fatigue and weight fluctuation," but his main complaint related to his memory; and as to his physical impairments, plaintiff stated "with the exception of lifting, he [was] functional [to do] tasks" (Tr. 579). Similarly, during Dr. Sand's examination, plaintiff's complaints dealt with concentration and memory, not fatigue or exertional limitations (Tr. 597-98).

Dr. Bradley's own records contradict his opinion of disabling fatigue due to hepatitis C: On August 15, 2008, after reviewing test results, the physician wrote, "Therefore, it does not appear that the Hep C is terribly active, and not likely causing fatigue, etc." (Tr. 547).

Based on the above analysis, I find that there is substantial evidence supporting the ALJ's decision to discount these opinions for the period prior to April 25, 2008.

As to plaintiff's mental capacity, on January 14, 2006, Rick D. Thomas, Ph.D., evaluated the plaintiff at the request of the agency.[3] The doctor reported a diagnostic impression of bipolar I disorder, most recent episode manic, and provided a global assessment of function (GAF) for plaintiff of 65, both then and during the prior year.[4] Dr. Thomas noted that plaintiff demonstrated an excellent ability in understanding and remembering instructions and that he maintained concentration and persistence in tasks. The doctor observed that plaintiff had a history of making friends with his co-workers and fellow church members. Dr. Thomas also concluded that plaintiff had achieved optimal control of his medications, but could benefit from additional instruction on relapse prevention from a psychologist (Tr. 168-71).

On January 26, 2006, J. Edd Bucklew, Ph.D., after reviewing the treating psychiatrist's records and the results of Dr. Thomas' consultative examination, opined that plaintiff's mental

---

[3] Although Dr. Thomas' report lists a January 14, 2005 examination date, this appears to be in error. The report was prepared in 2006.

[4] A GAF of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

impairment, while severe at the time of the evaluation, would not last 12 months (Tr.184-97).

On August 31, 2006, Sergio Zaderenko, M.D., plaintiff's treating psychiatrist, completed a *Mental Impairment Questionnaire (Listings)* form at the request of plaintiff's counsel, which diagnosed plaintiff with a bipolar I disorder; rated him as GAF 70, both during the current and prior year; and asserted that plaintiff was unable to work full time. Dr. Zaderenko reported that the signs and symptoms of plaintiff's bipolar disorder included poor memory; mood disturbance; emotional lability; difficulty thinking or concentrating; social withdrawal/isolation; blunt, flat or inappropriate affect; and decreased energy. Functionally, the psychiatrist thought that plaintiff had moderate restrictions of activities in his daily living; moderate difficulties in maintaining social functioning; marked deficiencies in concentration, persistence, or pace; and repeated episodes of decompensation at work or in work-like settings.[5]. Dr. Zaderenko also thought that plaintiff's chronic mental impairment caused a residual disease process resulting in such marginal adjustment that even a minimal increase in mental demands or a change in the environment would cause plaintiff to decompensate. Dr. Zaderenko opined that plaintiff's impairments would cause him to miss more than four days of work per month, and that plaintiff's inability to remain on task would make it difficult for him to work at a regular job on a sustained basis (Tr. 198-201).

On April 25, 2008 and December 13, 2010, Dr. Zaderenko filled out additional *Mental Impairment Questionnaires (Listings)* forms at the request of plaintiff's counsel. The doctor's opinions remained unchanged, however he lowered plaintiff's then-current GAF ratings from 70 to 60 (Tr. 265-68, 558-61).[6]

---

[5] As to the last functional limitation, the form submitted by plaintiff's counsel to the treating psychiatrist lacked the qualifier that the episodes of decompensation had to be "each of extended duration."

[6] A GAF of 51 to 60 means some moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) <u>or</u> moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

On October 17, 2008, John Keough, M.A., a licensed psychologist, evaluated plaintiff at the request of the agency. Plaintiff was uncooperative and put forth minimal effort during the evaluation, although the psychologist observed that plaintiff demonstrated no difficulty engaging in the interview or following simple instructions. The psychologist administered the Wechsler Memory Scale-III (WMS) to test plaintiff's memory function. Because the psychologist concluded that plaintiff was not putting forth his best effort, the test results were viewed as an inaccurate representation of plaintiff's memory. Therefore, the psychologist concluded that a plaintiff was actually functioning at least in the low-average range. Furthermore, based on the Trail Making Test, the psychologist opined that any organic memory insult would be minimal, if it existed at all. Overall, the psychologist believed that plaintiff could understand and remember instructions of a simple to moderate complexity; his ability to sustain concentration, persist in tasks, and maintain pace would be adequate unless experienced in a complex or demanding setting; and his ability to adapt to the environment of others, adjust to changes in routine, respond appropriately to supervision, and interact in social situations in an appropriate manner, were mildly to moderately impaired by his mood disorder and personality deficits (Tr. 562-66).

On October 20, 2008, Keith L. Allen, Ph.D., reviewed Dr. Zaderenko records, plaintiff's statements, and the results of the 2008, consultative psychological examination, and concluded that plaintiff has a severe impairment, i.e., the bipolar mood disorder, that causes mild restriction of daily activities; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation for an extended duration (Tr. 567-78).

On December 11, 2011, Nina L. Epperson, M.S., psychologist, examined plaintiff at the request of the ALJ. On the Wechsler Adult Intelligence Scale-IV (WAIS-IV), plaintiff gave up easily on several tasks and gave limited responses to verbal and arithmetic subtests. Plaintiff's

full scale IQ (77) placed him within the borderline range of intelligence, and his verbal and nonverbal reasoning abilities placed him in the low average range. The psychologist diagnosed plaintiff as suffering from a bipolar I disorder, most recent episode manic; cluster B traits; and GAF of 52. The psychologist rated plaintiff as having no limitation in four work-related areas, mild limitation in two work-related areas, moderate limitation in four work-related areas, marked limitation in zero work-related areas, and extreme limitation in zero work-related areas. Finally, the psychologist thought that plaintiff's difficulties in the workplace were likely due to character issues because plaintiff preferred to approach tasks from his perspective rather than following the instructions of others (Tr. 581-91).

At the 2010, and 2011 hearings, the ALJ elicited testimony from Dr. Jonas, a medical expert, who disagreed with Dr. Zaderenko's assessment that plaintiff has "marked" functional limitations. Rather, the doctor found no limitations in plaintiff's concentration, persistence, or pace (Tr. 307-12).

In the ALJ's October 27, 2011 decision, he acknowledged some conflict in the opinions and reports from treating and examining physicians, psychologists, and third parties. While acknowledging reports of adverse clinical signs in Dr. Zaderenko's notes before April 25, 2008, the ALJ found that those notes supported his finding that plaintiff's cognitive abilities did not become disabling until April 25, 2008. The ALJ observed that while the physician asserted that plaintiff was unable to work full time on August 31, 2006, he had rated plaintiff's GAF as 70 for that year and the prior year. The ALJ cited Dr. Thomas's January 2006 report where plaintiff reported almost no symptoms from his bipolar disorder when on his medications. The ALJ cited the January 2006 statement by plaintiff that he had no problems understanding or remembering instructions. The ALJ also pointed out that the results of Dr. Thomas' examination were inconsistent with plaintiff's hearing testimony as his memory deficits; that the results of Ms. Epperson's February 2011 consultative examination supported the

17

conclusion that plaintiff's deterioration began sometime after his then alleged October 2005 disability onset date; and that the testimony of plaintiff's wife supported the conclusion that plaintiff's deterioration occurred within the last few years (Tr. 284-300).

I find no evidence supporting Dr. Zaderenko's allegation of repeated episodes of plaintiff's decompensation. There were no emergency room visits and no inpatient hospitalizations for any emotional problems after 2005. During Dr. Thomas's January 2006 examination, plaintiff reported multiple prior inpatient hospitalizations for his bipolar disorder, but said he experienced almost no bipolar symptoms at the time of the evaluation, attributing the lack of symptoms to his medication (Tr. 168). Plaintiff made similar statements during Mr. Keough's October 2008 examination (Tr. 562); Dr. Debroy's November 2008 examination (Tr. 579); and Ms. Epperson's February 2011 examination (Tr. 585).

Plaintiff was followed by Dr. Zaderenko for medication checks once every three-to-four months (Tr. 558), and his notes do not reflect any episodes of plaintiff's decompensation for any period - short or long. Additionally, the notes reflect that plaintiff's medication regime has undergone little change since October 2005 (Tr. 202-12, 261-63, 164-69, 532-56). Based on the above, I find that there is no substantial evidence of repeated and extended episodes of plaintiff's decompensation since October 2005.

Records from third-party lay sources, for the period October 2005 through April 2008, also do not support a marked level of impairment in plaintiff's concentration, persistence, or pace. On the other hand, there is corroboration for the marked impairment after April 2008. For example Deborah Catron wrote a December 30, 2009 letter in which she described an incident during the Summer of 2009, when plaintiff failed to follow instructions and correctly perform yard work (Tr. 505-06); plaintiff's daughter, in an August 7, 2011, letter, conceded that her father no longer experiences mania requiring hospitalization because of the effectiveness of his medication, but complained that the medication has progressively affected

his everyday activities and behavior, and observed that plaintiff frequently tires and sleeps (Tr. 517); and plaintiff's wife, in an August 7, 2011 letter, recounted then recent incidents including one when plaintiff experienced an inability to recall and follow instructions, which wound up costing the family over $2,000 to replace a car engine, and concluded that these memory failings were increasing (Tr. 518).

In summary, I find that substantial evidence supports the ALJ's finding that no opinion was entitled to controlling weight for the period ending April 24, 2008.

## B.    EVALUATING NON-MEDICAL EVIDENCE

Plaintiff next argues the ALJ failed to properly evaluate non-medical evidence including letters and evaluations from his current and former employers.

Defendant responds that the ALJ cited plaintiff's good work history prior to 2005 and his most recent part-time employment.

On plaintiff's 2000 annual performance evaluation with Access Industries, Inc., his overall performance rating was "low commendable" (Tr. 103-04) and on a 2004, performance evaluation with the city of Peculiar, plaintiff's overall score was "good" (Tr. 105-06).

On April 24, 2008, and December 27, 2010, Terry L. Hardy, president and owner of L.T. Oil Company, described plaintiff's mental problems as mainly involving memory, focus, and concentration (Tr. 164-65, 510-11).

Substantial evidence on the record as a whole requires taking into consideration evidence that both supports and detracts from the ALJ's decision.   Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000); Universal Camera Corp. v. NLRB, 240 U.S. 474, 488 (1951). "Substantial evidence is less than a preponderance of the evidence but enough for a reasonable mind to find it adequate to support the Commissioner's conclusion. Craig, 212 F. 3d at 436. The ALJ must not ignore evidence that may detract from his findings of fact.   Cline v. Sullivan, 939 F. 2d 560, 564 (8th Cir. 1991); Delrosa v. Sullivan, 922 F.2d 480, 484 (8th Cir. 1990);

<u>Fowler v. Bowen</u>, 866 F.2d 249, 252 (8th Cir. 1989). Evidence from non-medical sources should be evaluated using factors such as the nature and extent of the relationship with the plaintiff and whether the evidence is consistent with other credible evidence in the record. SSR 2006-3p

Although plaintiff argues that the performance assessments from Access Industries and the City of Peculiar support his allegations of a long history of problems resulting from memory and concentration problems, I find the opposite to be true. The overall rating at Access Industries was "low commendable," and the overall rating at the City of Peculiar was "good." As to Access Industries, I find the assessment especially significant because it tends to contradict plaintiff's testimony that he was fired from his position as a packager at Access due to poor performance – an allegation for which he submitted no documentation. Although the performance assessment included negative comments, it concluded that plaintiff was functioning at the low but commendable level, which detracts from plaintiff's allegations of long-term memory and concentration problems.

I find that the record supports the ALJ's reliance on Dr. Jonas's observations that the report from the current employer, although including many negative statements, still reflects cognition greater than that suggested in plaintiff's testimony. As Dr. Jonas observed, despite the negative statements by the employer, he hired and paid plaintiff (Tr. 312).

## C. CREDIBILITY OF PLAINTIFF AND HIS WIFE

Next, plaintiff argues that the ALJ did not properly evaluate his credibility and the credibility of his wife. Plaintiff complains that the ALJ's discussion of credibility was inadequate.

In response, defendant argues the ALJ consider plaintiff's credibility throughout the decision, but particularly when contrasting his testimony unfavorably with the medical record and the medical opinions. Furthermore, defendant observes that the ALJ relied on the wife's

testimony when concluding that plaintiff's condition had deteriorated in the past few years.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court must defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). SSR 1996-7p incorporates the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board). The Eighth Circuit has noted that when the ALJ referred to the Polaski considerations and cited inconsistencies in

the record, he or she may properly find a plaintiff not credible. <u>Lowe v. Apfel,</u> 226 F.3d 969, 972 (8th Cir. 2000).

As noted above, the ALJ discussed both the plaintiff's past work history and his part-time employment since the alleged disability onset date. The ALJ properly discussed contradictions between plaintiff's daily activities, including his work activity since 2000, and plaintiff's allegations of long-term memory loss and impaired concentration. Despite plaintiff's current allegations of disabling symptoms from the hepatitis C, the ALJ cited conflicting evidence such as plaintiff's statements at the consultative examinations and his current lack of treatment for the condition. In addition, the ALJ cited plaintiff's poor effort and motivation during the 2008, and 2011, consultative psychological evaluations.

On review of plaintiff's wife's testimony at the August 2011 hearing, when questioned about the onset of her husband's memory problems, she said that "he worked for Access Industries for, I believe, 11 or 12 years, and . . . all of sudden, he was being written up" (Tr. 322). The wife did not testify that the problems began 11 or 12 years earlier. At the April 2008, hearing, Ms. Twyman described plaintiff with a "rapid decreasing condition" (Tr. 47).

Based on the above analysis, I find that the ALJ did not err in his credibility determinations on the testimony from plaintiff and his wife.

## D.     TRANSLATION OF FUNCTIONAL LIMITATIONS INTO RFC LIMITATIONS

Finally, plaintiff argues that although the ALJ found a "moderate" deficit in plaintiff's social functioning and a "moderate" deficit in plaintiff's concentration, persistence, and pace, the judge failed to take into consideration the practical ramifications of these functional limitations in the RFC.

In response, defendant cites the ALJ's limitations of plaintiff to simple and repetitive tasks, and the fact that unskilled work ordinarily involves dealing with objects, not people.

The Eighth Circuit has held that a limitation to simple, repetitive, and routine tasks

22

adequately captures a plaintiff's deficiencies in concentration, persistence, and pace.   Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001) (citing Brachtel v. Apfel, 132 F.3d 417, 421 (8th Cir.1997) (holding that hypothetical including the "ability to do only simple routine repetitive work, which does not require close attention to detail" sufficiently describes deficiencies of concentration, persistence or pace)).

Unskilled work ordinarily involves dealing primarily with objects, rather than with data or people. See SSR 1985-15. The mental activities of competitive, remunerative, unskilled work require only that a claimant respond appropriately to supervision, co-workers and usual work situations. See SSR 1996-9p.

The ALJ found that plaintiff could not follow any detailed instructions or perform detailed tasks before April 25, 2008; instead, the judge found that plaintiff required repetitive work.   The ALJ explained in his decision that although plaintiff has problems with memory and concentration, these problems are not as severe as alleged - especially before April 2008. These findings therefore adequately translate the functional limitation into a work-related limitation.

The ALJ did not include any specific work-related social limitation, but limited plaintiff to unskilled work.   By definition, unskilled work ordinarily requires dealing with objects, not people.   During the 2006, 2008, and 2011, physical and psychological examinations, plaintiff denied any significant problems with interpersonal relations and no such problems were noted by any of the consulting examiners.   Therefore, the ALJ's restriction of plaintiff to unskilled work adequately addressed this functional limitation.

## VII.   CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision.   Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.   It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

February 6, 2014
Kansas City, Missouri